Appeal No. 10-12232-JJ

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

## SHERRIE KAW

(Plaintiff-Appellant)

v.

## SCHOOL DISTRICT OF HILLSBOROUGH COUNTY

(Defendant-Appellee)
_____

**On Appeal from the
United States District Court
for the Middle District of Florida
Tampa Division**

**District Court Docket No. 8:07-cv-2222-T-33TGW**
_____

## APPELLEE'S BRIEF
_____

Thomas M. Gonzalez
Florida Bar No.: 192341
Thompson, Sizemore, Gonzalez & Hearing, P.A.
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
Attorneys for the Appellee

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, the undersigned counsel of record hereby certifies that the following individuals and entities have an interest in this case:

1. The Honorable Virginia M. Hernandez Covington, United States District Judge, Middle District of Florida;

2. The Honorable Thomas G. Wilson, United States Magistrate Judge, Middle District of Florida;

3. Thomas M. Gonzalez, Thompson, Sizemore, Gonzalez & Hearing, P.A., counsel for Defendant/Appellee;

4. Thompson, Sizemore, Gonzalez & Hearing, P.A.

5. Sherrie Kaw, Plaintiff/Appellant;

6. Matthew W. Dietz, The Law Offices of Matthew W. Dietz, P.L.

7. The Law Offices of Matthew W. Dietz, P.L.

8. The School Board of Hillsborough County, Florida; Defendant/Appellee

No other trial judge, attorney, person, association of persons, firm, partnership, or corporation known to the Appellee, The School Board of Hillsborough County or its counsel, has any current interest in the outcome of this matter.

# PRELIMINARY STATEMENT

For purposes of this appeal, the Appellant, Sherrie Kaw, will be referred to as "Kaw."  The Appellee, School Board of Hillsborough County, Florida, will be referred to as the "School Board" or the "Appellee."[1]

The Appellee will refer to the record in compliance with Eleventh Circuit Rule 28-5.  Entries on the district court's docket will be referred to as "(R-(docket number): (page, paragraph, or exhibit number))," e.g., (R-5: 10), (R-5: ¶ 10), or (R-5: Ex. 10).

---

[1] The proper Defendant below was the School Board of Hillsborough County, Florida, a corporate body politic.  The "School District" is not an entity which may sue or be sued.  The School Board was and is the only proper party to this cause and it appeared and defended Kaw's suit.

## STATEMENT REGARDING ORAL ARGUMENT

The School Board believes that oral argument is appropriate in this case and could assist the Court in its analysis of applicable law to the record on appeal.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement ................... C-1

Preliminary Statement ................................................................................................ i

Statement Regarding Oral Argument ........................................................................ ii

Table of Contents ..................................................................................................... iii

Table of Citations ..................................................................................................... v

Jurisdictional Statement ........................................................................................... 1

Statement of the Issue .............................................................................................. 2

Statement of the Case ............................................................................................... 3

     I.     Nature of the Case ................................................................................ 3

     II.    Course of Proceedings and Disposition in the District Court ................ 3

     III.   Statement of the Facts ......................................................................... 4

Standard of Review .................................................................................................. 21

Summary of the Argument ....................................................................................... 22

Argument ................................................................................................................. 24

     I.     Kaw did not present evidence sufficient to establish the prima facie case of "regarded as" disabled under the ADA .................................... 24

          A.    Kaw did not present sufficient evidence that the School Board perceived her impairment as substantially limiting the major life activity of consciousness .......................................... 26

1.     Mere awareness of a nonlimiting impairment does not establish "regarded as" disabled ................................. 28

2.     Kaw failed to provide evidence that showed the School Board perceived her nonlimiting impairment to be more severe and frequent in nature than it actually was .................................................................. 29

     a.     Evidence of the School Board's perception ........... 32

     b.     The School Board did not perceive Kaw to have a disability ....................................................... 34

B.     Kaw did not establish that she was otherwise qualified to perform the essential functions of her job at the time she was terminated ..................................................................................... 43

C.     Kaw did not establish that she was terminated because of misperceptions of her nonlimiting impairment .......................... 45

II.     Kaw did not present evidence sufficient to show the School Board's legitimate, non-discriminatory, reason for firing Kaw was pretext for discrimination ..................................................................... 46

Conclusion ................................................................................................. 47

Certificate of Compliance ........................................................................ 49

Certificate of Service ................................................................................ 50

# TABLE OF CITATIONS

**Cases**                                                                        **Page**

**Supreme Court Cases**

Murphy v. United Parcel Serv., Co., 527 U.S. 516, 119 S. Ct. 2133 (1999)......25, 26

Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139 (1999), superseded by statute, eff. Jan. 1, 2009 (2008)...............................................25, 26, 27

Toyota Motor Mfr., Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S. Ct. 681 (2002), superseded by statute, eff. Jan 1, 2009 (2008)..........................................................26

**Circuit Court Cases**

Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653
  (11th Cir. 1998)..............................................................................21, 22, 25

Cash v. Smith, 231 F.3d 1301 (11th Cir. 2000)..............................................25, 30, 41

Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189
  (11th Cir. 2004)..............................................................................21, 22, 46

Collado v. United Parcel Serv., Co., 419 F.3d 1143 (11th Cir. 2005)............21, 25, 26

Corley v. Dep't of Veterans Affairs, 218 F. App'x. 727 (10th Cir. 2007)................35

Deas v. River West, L.P., 152 F.3d 471
  (5th Cir. 1998).............................................................…………………......passim

Earl v. Mervyns, Inc., 207 F.3d 1361 (11th Cir. 2000) .........................................…..43

E.E.O.C. v. Agro Distrib., L.L.C., 555 F.3d 462 (5th Cir. 2009)………………..24, 26

Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907 (11th Cir. 1996)....................22

Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258 (11th Cir. 2007) ............25

Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338 (11th Cir. 2005)............................25

**Cases**                                                                                  **Page**

**Circuit Court Cases (cont.)**

Hilburn v. Murata Elecs. North Am., Inc., 181 F.3d 1220 (11th Cir. 1999)............42

Holly v. Clairson Indus., L.L.C., 492 F.3d 1247 (11th Cir. 2002)......... 24, 25, 43, 45

Jackson v. Veterans Admin., 22 F.3d 277 (11th Cir. 1994) ......................................44

Kelly v. Drexel Univ., 94 F.3d 102 (3d Cir. 1996)…………………………………29

LaChance v. Duffy's Draft House, 146 F.3d 832 (11th Cir. 1998)..................... 31, 43

Martinson v. Kinney Shoe Corp., 104 F.3d 683 (4th Cir. 1997)..........................…..30

Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241 (11th Cir. 2001)...................22

Otting v. J.C. Penney Co., 223 F.3d 704 (8th Cir. 2000) .........................................34

Ross v. Rhodes Furniture, Inc., 146 F.3d 1286 (11th Cir. 1998) ..............................21

Sicilia v. United Parcel Serv., Inc., 279 F. App'x. 936 (11th Cir. 2008) ............ 30, 40

Smith v. United States, 894 F.2d 1549 (11th Cir. 1990) .........................................25

Sutton v. Lader, 185 F.3d 1203 (11th Cir. 1999) .....................……………....passim

Taylor v. Pathmark Stores, Inc., 177 F.3d 180 (3d Cir. 1999) ............................ 37, 38

United States v. Wright, 607 F.3d 708 (11th Cir. 2010) .........................................25

Wascura v. City of South Miami, 257 F.3d 1238 (11th Cir. 2001)...........................46

Williamson v. Motorola, 303 F.3d 1284 (11th Cir. 2002).........................................22

**Cases**                                                                                                     **Page**

**District Court Cases**

Bley v. Bristol Township Sch. Dist., 2006 WL 220669
  (E.D. Pa. 2006)............................................................................................ 35, 36, 37

Cadley v. N.Y. Dep't of Transp., 2008 WL 465199 (S.D.N.Y. 2008)…31, 35, 40, 41

Lomastro v. Caddo Parish Sheriff, 2006 WL 1805875 (W.D. La. 2006)......... 32, 33

Moreno v. Am. Ingredients Co., 2000 WL 527808
  (D. Kan. 2000) ............................................................ ………….passim

Rocky v. Columbia Lawnwood Regional Medical Center,
  54 F.Supp.2d 1159 (S.D. Fla. 1999) ...................................................................44

**Federal Statutes**

28 U.S.C. § 1291 ....................................................................................................... 1

29 U.S.C. § 794 .................................................................................................... 1, 3

42 U.S.C. § 12102(2)(A-C)...................................................................................24

42 U.S.C. § 12117 ............................................................................................... 1, 3

**Federal Regulations**

29 C.F.R. § 1630.2(j) ............................................................................................27

29 C.F.R. § 1630.2(n) ...........................................................................................43

**State Statutes**

Fla. Stat. § 760.11 ............................................................................................. 1, 3

# <u>JURISDICTIONAL STATEMENT</u>

Kaw's claims against the School Board were brought pursuant to Americans with Disabilities Act ("ADA"), Section 107(a), 42 U.S.C. § 12117; the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.11; and Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 794. On April 27, 2010, the district court granted the School Board's Rule 50(a) motion for a judgment as a matter of law, which overturned the jury verdict. The court found that the School Board did not regard Kaw as having an impairment that would be a disability. (R-161: 6).

Kaw filed her Notice of Appeal with the district court on May 11, 2010. This Court has jurisdiction over this appeal of a final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court properly granted the School Board's renewed motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50, overturning the jury's verdict in favor of Kaw and finding that Kaw did not provide sufficient evidence for a reasonable jury to conclude the School Board perceived Kaw's impairment as substantially limiting in the major life activity of consciousness to be "regarded as" disabled under the ADA.

# STATEMENT OF THE CASE

## I.  Nature of the Case

This matter is before the Eleventh Circuit Court of Appeals on an appeal from an Order entered on April 27, 2010, granting the School Board's motion for judgment as a matter of law, because Kaw failed to establish the School Board regarded her as disabled.  (R-161: 1-9).

## II.  Course of Proceedings and Disposition in the District Court

On February 13, 2008, Kaw filed her amended complaint against the School Board.  (R-1: 1-13).  The amended complaint alleges that Kaw was terminated from her position as a one-on-one aide in violation of the Americans with Disabilities Act ("ADA"), Section 107(a), 42 U.S.C. § 12117; the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.11; and Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 794.  (R-1: 1-13).  Both parties moved for summary judgment after discovery was completed.  (R-161: 2).  On January 30, 2009, the district court granted partial summary judgment for the School Board holding Kaw's impairment was not an actual disability.  (R-51: 19-20).  The district court, however, found a jury question existed regarding whether the School Board perceived Kaw's nonlimiting impairment as substantially limiting a major life activity.  (R-51: 20).

A jury trial was held during the week of October 5, 2009. At the close of Kaw's evidence, the School Board moved for a judgment as a matter of law for insufficiency of evidence pursuant to Federal Rule of Civil Procedure 50(a). (R-139: 17). The district court reserved ruling on the motion. (R-161: 2). The School Board renewed its Rule 50(a) motion at the close of their case. (R-141: 26). The district court again reserved ruling on the School Board's motion. (R-141: 26).

A jury verdict was returned in Kaw's favor on October 9, 2009. (R-147). On October 15, 2009, the School Board renewed its Rule 50(a) motion. The district court granted the School Board's motion on April 27, 2010, overturning the jury verdict, and finding a reasonable jury could not have found the School Board regarded Kaw as having an impairment that would be a considered a disability. (R-161: 6). Kaw filed a notice of appeal on May 11, 2010. (R-165).

III. Statement of the Facts

In 2002, Kaw was diagnosed as having a condition known as electrocardiogenic syncope or vasovagal syncope.[2] (R-51: 1-2). That condition can cause a reduction in cerebral blood flow to the point where the sufferer loses consciousness, i.e., faints. (R-14: ¶ 7). Fainting is a very common problem, and as much as ten percent of the population have experienced something similar to what Kaw feels when she loses consciousness. (R-152: 170). The specialist who treated

_____

[2] The impairment is also known as neurocardiogenic syncope. (R-152: 165).

Kaw, Dr. Anne Curtis, described the loss of consciousness caused by vasovagal syncope as similar to someone "fainting at the sight of blood or the military recruiter [who] stands too long in the hot sun." (R-152: 166). "As soon as the patient winds up lying down, usually they recover very quickly and they're completely normal again." (R-152: 166). "It's not a drop attack where they suddenly just collapse on you." (R-152: 208).

Prior to being diagnosed in 2002, Kaw suffered recurring and unexplained fainting spells. (R-51: 2). This situation improved almost immediately once she began receiving treatment from Dr. Curtis in May of 2005. (R-51: 2). The effects of Kaw's condition—including fainting—are characterized as "sporadic." (R-14: ¶ 8). Kaw was able to "prevent . . . fainting spells or syncopal episodes" by staying hydrated and listening to her body. (R-134: 60). If she began to feel lightheaded, dizzy or nauseous, Kaw could sit or lie down and the feeling usually would pass. (R-134: 60-61). Although most of Kaw's fainting spells could be prevented before they happened, occasionally, there would be no warning signs at their onset. (R-152: 183, 208-09). When Kaw did lose consciousness, she would feel exhausted for three or four hours after the episode.[3] (R-149: 13).

---

[3] Dr. Curtis described these aftereffects as a little unusual for a patient who faints; generally the person will recover faster. (R-152: 209).

## A.    Kaw's employment with the School Board

The School Board employed Kaw on two occasions for a total of over four years beginning in 1999.  (R-14: ¶ 8), (R-134: 61).  From 1999 to 2002, Kaw worked as a paraprofessional for an autistic child before quitting employment to undergo a few surgeries unrelated to her syncope.  (R-134: 61-62).  In 2005, Kaw applied for a position as a paraprofessional at Benito Middle School because her syncope was not an issue and she felt healthy.  (R-134: 62).  Kaw was familiar with Benito Middle School and its staff because both of her daughters attended that school.  (R-134: 62-64).  Kaw also knew the principal of Benito Middle School, Bobby Smith; he had been an assistant principal at Benito when Kaw's daughters matriculated at the school.  (R-134: 62-64).

Kaw applied for employment in 2005 by simply asking Smith if there were any openings for paraprofessionals.  (R-134: 65).  Smith informed Kaw there were openings to support three children, and he spoke with Mikki Kenny, the Exceptional Student Education (ESE) director at Benito Middle School, that same day.  (R-134: 65), (R-139: 166, 170).  Smith hired Kaw as a temporary one-on-one aide, and after reviewing the files for the three children, Kenny assigned Kaw to assist B.V., an autistic child with unique needs.  (R-134: 65-66), (R-139: 170-71).

All one-on-one positions at Benito Middle School, and in all Hillsborough County public schools, are temporary positions filled purely on an individual

student's needs.  (R-139: 170-72, 199).  If, at any point, the student does not need the level of support provided by the paraprofessional or the student transfers schools, the one-on-one position can be terminated.  (R-139: 171-72).  As a temporary employee, one-on-one aides were not provided benefits or leave and could be terminated, with or without cause, at any time.  (R-139: 6, 172), (R-149: 23).  One-one-one aides did not have their own classroom and were not provided keys to the school.  (R-134: 97).  Their sole duty was to provide constant attention to the one child to whom they were assigned, and they served at the pleasure of the principal or other site manager.  (R-139: 172, 199, 206, 228-29).

As an ESE student, B.V. was the subject of an individual education plan (IEP), which established, inter alia, the assistance and support he would receive to provide him with a free and appropriate public education (FAPE) as required by law.  Both the IEP and FAPE are required by federal and state laws.  The IEP controls the treatment of and services provided to an ESE student, and it must be followed.  B.V.'s IEP expressly required a one-on-one aide to provide him with "continuous supervision" and to stay in very close proximity to him at all times because of B.V.'s potentially destructive tendencies.  (R-139: 173-74), (R-134: 67-68).  B.V. also needed continuous prompting from his one-on-one aide for his own safety and to keep him on task.  (R-139: 170-71, 174).  Simply put, if B.V. was not

closely watched, he could hurt himself.[4] (R-139: 173-74), (R-134: 67-68). For example, B.V. would take apart pencil sharpeners to get the blade and would make his nose bleed to "gross out" fellow students. (R-134: 67-68), (R-139: 174). B.V. also had a tendency to pull out his hair. (R-139: 174).

If Kaw was absent, it was difficult to replace her because B.V. did not easily accept the presence of new people. (R-139: 176). B.V.'s destructive tendencies could be set off if he was not comfortable with the new person or the new person was not familiar with him. (R-139: 176). Any person used to replace Kaw would have to go through a screening process before that person could serve him. (R-139: 176).

## B. Kaw's fainting episodes at work

During her employment at Benito Middle School, Kaw lost consciousness at work on two occasions. (R-14: ¶ 9). The first incident occurred in September of 2005, shortly after Principal Smith hired her (R-14: ¶ 9), as Kaw was walking in a hallway of the school. (R-134: 72), (R-51: 4). Paramedics were called to the

---

[4] According to Kenny, B.V. had "unique needs":

> Well, he—the reason behind [B.V.] having the unique needs or one-on-one paraprofessional is for his safety. And it was for his environmental safety. He was unaware of—when he was in danger of community dangers. And it was to keep him focused and on task and to feel safe, somebody to sit next to him for the constant cueing and prompting. When someone wasn't there to monitor that, he would easily pull out his hair, he would easily put stuff in his nose, sharpened pencils and make himself bleed and get blood everywhere.

(R-51: 2-3 (quoting R-24: 70)).

school, and Kaw was taken to the hospital, where she regained consciousness. (R-134: 72). She was not injured. (R-134: 73).

Prior to this incident, Kaw had hoped she would not have any fainting spells or syncopal episodes at work and therefore had not mentioned her condition to Smith (nor was she asked about any limiting conditions or given a physical examination as part of the hiring process). (R-134: 73), (R-134: 63-65). Since she had an incident at school, she decided it would be best to explain her condition to Smith. (R-134: 73), (R-134: 63-65). When Kaw came back to school, she informed Smith that she suffered from a condition that could cause her blood pressure to fall to a level at which she would faint. (R-14: ¶ 9), (R-134: 72-73). Kaw assured Smith that it was "not life threatening" and that she was "fine," but it was just something she would have to deal with. (R-134: 73). It is undisputed that neither Smith nor any other employee of the School Board took or contemplated any employment action against Kaw because of the fainting spell or her condition.

In April of 2006, Kaw experienced a second fainting spell at school. (R-134: 73-74), (R-14: ¶ 9). This time, Kaw fainted in a classroom but regained consciousness while the paramedics, who had been called again, were administering to her. (R-134: 74). Kaw explained to the paramedics that her fainting was "not a medical emergency" and that she did not need to go to the

hospital. (R-134: 75). Again, it is undisputed that no employment action was contemplated against Kaw because of her loss of consciousness.

In fact, and notwithstanding Smith's full awareness of Kaw's condition and her two fainting spells at school, she was rehired to serve as B.V.'s one-on-one aide for the 2006-2007 school year.[5] (R-134: 71, 73), (R-51: 4). Kaw did not have a fainting spell at work that year. (R-134: 76). She did, however, experience episodes of dizziness that she was able to control by sitting down for a few minutes in the teacher's lounge and drinking water. (R-134: 76).

## C. Kaw's incident at work on August 24, 2006, and her subsequent absences from work without communication to her employer

On August 24, 2006, Kaw became lightheaded at work and felt some pressure in her chest.[6] (R-134: 76). She did not lose consciousness, but went to see the school nurse, Starla Rohl, who took her blood pressure and advised her to go home. (R-134: 76-77), (R-152: 20). Kaw told Mary Farrugio, the principal's secretary, and Nurse Rohl that she was going to call her doctor when she got home. (R-134: 77-78). Farrugio said she would let Smith know Kaw was going home and how she felt. (R-134: 78-79). When Kaw got home, she called Dr. Curtis's

---

[5] In addition to fainting at school, Kaw missed a number of days of work during the 2005-2006 school year. (R-134: 69).

[6] Chest pains are not a symptom related to syncope. (R-152: 192-93).

office,[7] which scheduled Kaw for an appointment with nurse practitioner Cindy Rodriguez, on September 6, 2006, and with Dr. Curtis, her treating physician, on October 3, 2006.[8]  (R-134: 79, 81-82), (R-152: 193).

Kaw "called the [school] office at some point to let them know" that she called the doctor's office, (R-134: 77), and "mentioned that [she] was able to see someone in the [doctor's] office on . . . September the 6th."  (R-134: 82).  Kaw said the person at the school office told her to "come back to work after you see your doctor."  (R-134: 77).  Kaw, however, admits she does not recall exactly what she was told by the person at the school office, only her understanding of what was said.  (R-152: 23-24).  This was Kaw's only contact with the school prior to being seen by Nurse Rodriguez, (R-152: 24-25) almost two weeks after feeling lightheaded at work. (R-134: 76).  Kaw did not see or talk to Smith until September 18, 2006, almost four weeks after feeling lightheaded at work.  (R-134: 86), (R-152: 27-29).  As noted, because of her employment status as a temporary employee, Kaw was not entitled to sick or any other leave.

On September 6, 2006, Kaw saw Nurse Rodriguez at Dr. Curtis's office.  (R-156: Ex. 3).  She still had not seen Dr. Curtis, but Rodriguez informed Kaw that

_____

[7] Dr. Curtis's office records indicate that Kaw called on August 29, 2006.  (R-152: 185-89), (R-156: Ex. 36).

[8] At some point, Kaw's appointment was moved from October 3, 2006, to September 18, 2006, as Kaw actually saw Dr. Curtis on September 18, 2006.  (R-134: 88).

she, Rodriguez, would feel more comfortable if Kaw wore a 30-day event monitor[9] because Kaw's complaint of tightness in her chest and "something [Nurse Rodriguez] heard." (R-134: 80). Nurse Rodriguez instructed Kaw not to return to work until her appointment with Dr. Curtis scheduled for September 18, 2006. (R-156: Ex. 3). Nurse Rodriguez was not a physician and did not specialize in electrocardiogenic syncope. (R-134: 85). She therefore preferred Kaw see Dr. Curtis before returning to work. (R-134: 85).

On September 7, 2006, two weeks after leaving school, Kaw attempted to hand deliver Nurse Rodriguez's note to Smith and inform him that she would be wearing an event monitor for thirty days.[10] (R-134: 85-86), (R-152: 25-26). Kaw did not find Smith on September 7, 2006, so she placed the note from Nurse Rodriguez on his desk without providing any explanation. (R-152: 26). The note made no mention of her fainting spells or that her health issues were related to her

---

[9] An event monitor is a device attached to a patient by electrodes. (R-152: 175). It captures and can report episodes of rhythmic irregularities in which the patient's heart beats too fast or too slow. (R-152: 175). If Kaw experienced dizziness or near fainting, she could press a button on the device and it would "record and store the electrocardiogram from that specific event," which allowed her doctors to review the data at a later time. (R-152: 175). If the monitor beeped, Kaw was "to use a [telephone] land line and press a button" and then someone from a company would talk to her and let her know whether there was a problem. (R-134: 85).

[10] Kaw originally testified that she hand delivered the note to Smith and told him how long she would be wearing the event monitor. (R-134: 86). Kaw later admitted she did not see or talk to Smith on September 7th. (R-152: 26).

syncope.[11]  (R-156: Ex. 3).  The note also did not mention the event monitor.  (R-156: Ex. 3).  Kaw and Smith did not discuss the issue on September 7th; Kaw did not see or talk to Smith until September 18th. (R-134: 86), (R-152: 27-29).

On September 18, 2006, Kaw finally saw Dr. Curtis.  (R-134: 88).  Kaw did not mention to Dr. Curtis that her event monitor went off the night before, and, in any event, Dr. Curtis did not focus on the event monitor because she did not believe the event monitor was necessary.  (R-152: 204-07).  Dr. Curtis found that "[t]he etiology of [Kaw's] symptoms [to] not [be] entirely clear."  (R-157: Ex. 36).  According to Dr. Curtis, vasovagal syncope appeared to be the most likely etiology, but she wanted to run tests before putting Kaw on any medication.  (R-134: 88), (R-152: 211), (R-157: Ex. 36).  Dr. Curtis scheduled a tilt table test,[12] which was conducted by her echocardiographer, for October 3, 2006. (R-134: 88), (R-152: 211).

---

[11] The note simply stated: "Unable to return to work until follow-up 9/18/06."  (R-156: Ex. 3).

[12] A tilt table test is a noninvasive diagnostic test designed to observe a patient's symptoms.  (R-152: 211-12).  The patient is tilted at an angle to see if the patient will faint.  (R-152: 213).  During the test, the patient's pulse and blood pressure are recorded serially, and, if they both drop, syncope is the diagnosis.  (R-152: 212). Usually the diagnosis is clear to the echocardiographer, but, if the numbers are not close, then the results are given to Dr. Curtis to interpret.  (R-152: 212).  Dr. Curtis will see her patients after the tilt table test to inform them of the results and prescribe any necessary medication.  (R-152: 212-13). There are practically no aftereffects of a tilt table test.  (R-152: 213).

Dr. Curtis gave Kaw a consent to return to work form on September 18, 2006, which was signed by her intern, Dr. Whitaker. (R-134: 88), (R-156: Ex. 4). Dr. Curtis felt that Nurse Rodriguez had been "overly cautious," that there had been no medical reason why Kaw could not have worked from September 6th through September 18th, and that she would not have put Kaw on such a restriction. (R-152: 176-77). In fact, Dr. Curtis thought the work restriction note, like the event monitor, "was [a] little bit [of] overkill." (R-152: 196). Neither Smith nor the School Board was informed of these opinions by Dr. Curtis. Dr. Curtis's note simply stated Kaw "may return to work" and made no mention about her impairment or for what she was being treated. (R-156: Ex. 4). No one at the school had requested Kaw bring a note to allow her to return to work. (R-149: 21).

Kaw took her note to Smith on September 18, 2006. (R-134: 89-90). She met with Smith for "20 to 30 minutes," and, during that time, Kaw's event monitor activated twice, producing a loud beeping sound. (R-134: 90, 92), (R-152: 33). After Kaw explained what the monitor was for, Smith asked her if there was something she had to do when it alerted. (R-134: 90). She responded, "well, it kept me up all night. It was going off. And, you know, uh, it's probably nothing, but, yeah, I'm supposed to transmit information through a land line." (R-134: 90). Smith offered his phone for Kaw to use, which she did. (R-134: 90).

Smith mentioned that the alerting monitor could be a distraction in the classroom because Kaw would have to leave the classroom in order to transmit the information. (R-134: 92-93). If Kaw's monitor went off when she was with B.V., the closest telephone land line for her to transmit information would be in one of the teacher planning areas. (R-152: 32). During the September 18, 2006, meeting with Smith, Kaw mentioned to Smith and Kenny that she had a tilt table test scheduled for October 3, 2006, and explained what it involved. (R-134: 90, 92).

> Mr. Smith said for, uh – for the sake of continuity that it was better for me not to be coming and going. That B.V. was working with this person that he had lunch with prior to my absence. And, uh, that would continue to happen until my tests were done. And to come back after my tests were done.[13]

(R-134: 90-91).

Smith told Kaw to "keep [him] in the loop and let [him] know how things are going." (R-134: 92). Kaw did not have any other interactions or conversations with Smith before her employment was terminated on October 5, 2006, almost three weeks later. (R-134: 92).

---

[13] There was a dispute on this issue at trial. Kaw testified that Smith said it was better that she not return to work until she no longer was wearing the event monitor. (R-134: 92-93). Smith attributes that sentiment to Kaw. (R-139: 240). For purposes of the motion for judgment as a matter of law and this appeal, Kaw's version controls and is related here. Nevertheless, it is undisputed that Kaw did not tell Smith that her physician did not feel the event monitor was not necessary. (R-152: 206).

Kaw discovered that her event monitor was defective, and she had it replaced a few days after the meeting with Smith. (R-152: 36). She did not update Smith, because she did not think he was concerned about the event monitor. (R-152: 36).

On September 29, 2006, Kaw went to the emergency room complaining of chest pain, but it is undisputed that the symptom was not related to the syncope. (R-149: 16), (R-152: 39, 192-93). Kaw did not inform Smith about her visit to the emergency room. (R-152: 37-38); (R-134: 92). On October 3, 2006, Kaw underwent the tilt table test, which was positive for a syncope because both her blood pressure and pulse dropped. (R-134: 88, 93-94), (R-152: 211-13). It is undisputed that Kaw did not attempt to contact Smith after the testing was completed, despite his instruction to keep him informed, or return to work. (R-134: 92). That night, Kaw had another syncopal episode and lost consciousness. (R-134: 94). Kaw did not inform Dr. Curtis or Smith that she lost consciousness. (R-152: 40-42), (R-134: 92).

Kaw went to the hospital on October 4, 2006, complaining of chest pressure and shortness of breath. (R-134: 94-95). It is undisputed that these symptoms are unrelated to syncope or the tilt table test. (R-152: 181-82, 213-14). When Kaw returned home, on October 6, 2006, she received a letter informing her she had been terminated from her position at Benito Middle School. (R-134: 95-96). The

letter, which was dated October 5, 2006, stated that Kaw had been terminated due to concerns that she was "not able to fulfill the responsibilities of the position for which [she was] hired." (R-156: Ex. 5).

During Kaw's five-week plus absence from work, B.V. had been assisted and supervised by Jay Carter. (R-134: 87), (R-152: 19). Carter was a temporary paraprofessional at Benito Middle School for an academic behavior support classroom. (R-139: 185), (R-152: 19-20). Previously, Carter had spent time with B.V. while Kaw took her lunch and other breaks. (R-134: 87). As a result of Kaw's absences, Carter had to be taken from his classroom to work full-time with B.V. if B.V.'s mother was not available to assist. (R-134: 87), (R-152: 19).

In the 2005-2006 school year, Kaw had missed time for illnesses unrelated to her impairment and for a family trip.[14] (R-134: 69-70), (R-149: 21-22). Her absences "were always approved time – time off."[15] (R-134: 69). Kaw would

---

[14] Indeed, during that school year, Kaw missed approximately 40 days of work, most of which occurred on Mondays and Fridays. (R-149: 21). After Kaw's first syncopal episode in September of 2005, she took off seven of the next eight school days. (R-152: 11-12). Kaw was worried and embarrassed about her syncope, but did not see Dr. Curtis. (R-152: 12). Kaw did, however, stay in touch with Smith during this time. (R-152: 13).

In the beginning of the 2006-2007 school year, Kaw took off five days unrelated to her syncope. (R-152: 16-17).

[15] Kaw did not receive a warning for taking too much time off, but she always received prior permission and kept Smith and the School Board fully informed of the situation. They were able to plan for her absences accordingly. (R-134: 69-70). In Kaw's position, she was not entitled to sick days or annual leave. (R-149: 23).

ensure that Smith and B.V.'s mother knew she was going to be absent so B.V. would have supervision.  (R-134: 69).  During these absences in the 2005-2006 school year, B.V.'s mother would have his nanny come to the school to volunteer as B.V.'s one-on-one aide.  (R-152: 17).  The nanny, however, was not available in the 2006-2007 school year, forcing the school and Smith to take Carter from his regular position to supervise B.V. during the day.  (R-152: 17-20), (R-139: 193).

**D.    Events following Kaw's termination and her offer for reinstatement**

Kaw saw Dr. Curtis on October 9, 2006, at which time Dr. Curtis prescribed medication for the syncope.  (R-134: 98, 100).  This new medication helped Kaw with her condition.  (R-149: 15).  On that same day, one of Dr. Curtis's fellows provided Kaw with the following note:

> Whom it May Concern,
>
> Sherrie Kaw is a patient here with USF Cardiology.  She is undergoing treatment for a condition known as vasovagal syncope. Although we cannot guarantee she will not pass out again, there is no medical reason she cannot continue to work as a teacher[16] with minor precautions.  We would be happy to discuss the matter further over the phone if necessary.

(R-156: Ex. 10).  Kaw hand-delivered the note to Smith the same day.  (R-134: 100).  It is undisputed that this was the first time Kaw had mentioned or provided information that indicated she was being treated for a syncope during her

---

[16] She, of course, was not a teacher who had help—she was a one-on-one aide for an autistic child with unique needs who needed constant supervision.

absences.[17]  Smith told Kaw that she was an "exemplary employee" and had "done wonderful things with B.V," but that she was presently a "liability to the school district [because] [y]ou may cause, uh – by fainting you may cause danger to yourself or – or to – to the students here and, uh, we have to protect them."[18]  (R-134: 101).

Following her termination, Kaw went to the office of Dr. Joseph Trumbach, the manager of the non-instructional personnel department for the Hillsborough County School District, because she thought he might be able to get her job back. (R-134: 102), (R-39: 5).  Mr. Trumbach did not see or talk to Kaw that day, but called her the following day to get permission to talk with Dr. Curtis's office for more information.  (R-134: 102-06), (R-152: 50, 53).  Kaw proceeded to gather as many doctor notes that she could that stated she was able to work because she hoped these documents would be enough for Smith to reinstate her.[19]  (R-134: 107, 127), (R-152: 63-64).  Smith later informed Kaw that there was going to be a meeting regarding her reinstatement.  (R-134: 141-43).

---

[17] Dr. Curtis ordered the tilt table test for October 3, 2006, as a diagnostic tool.  (R-152: 178).  "I was trying to be sure about what the diagnosis was I was trying to treat at this point."  (R-152: 179).  Kaw did not inform Smith about the result of her tilt table test until after she was actually terminated.

[18] Again, as there is a factual dispute as to Smith's words, for the purpose of the motion and this appeal, Kaw's version is described herein.

[19] Neither Trumbach nor Smith requested these notes.  (R-152: 54-58).

Kaw met with Smith on November 15, 2006. (R-134: 146). At this meeting, Smith handed Kaw a letter allowing her to return to the position as B.V.'s one-on-one aide. (R-134: 146), (R-156: Ex. 30). The letter, dated November 10, 2006, stated:

> Dear Mrs. Kaw,
>
> The Hillsborough County Public School District has accepted your physician's release to work. It is always good to see an employee return to a state of good health. With this release, you are being offered re-employment in your most recent position as a One-on-One ESE Aide at Benito Middle School. You will be assigned to student [B.V.]. It is our hope that your good health continues to allow you to serve as a productive employee of our school district. Should circumstances change, we will address them accordingly.

(R-156: Ex. 30). Kaw did not sign the reinstatement letter because she felt nothing had changed regarding her health and she was concerned that she could be fired at any time. (R-134: 147). Kaw admitted, however, the medicine did help and that she did not experience another fainting spell until March of 2008. (R-149: 15), (R-134: 100). At this same meeting, Smith informed Kaw that a private Christian school had contacted him regarding Kaw, and that he gave the school a positive recommendation. (R-134: 147), (R-152: 78).

On November 20, 2006, Kaw sent Smith an email informing him that she had sought legal advice and wanted to discuss the reinstatement offer with her attorney. (R-134: 149), (R-156: Ex. 31). Following her termination, Kaw worked

as a substitute teacher at New Tampa Christian Academy from October 23, 2006,[20] until January of 2007, (R-134: 139-40, 141), when she was hired as a teacher for a three-year-old child at Tampa Christian.  (R-134: 151).

## STANDARD OF REVIEW

The standard of review for a judgment as a matter of law is de novo.  Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998).   In a de novo review, the court reviews the judgment, "not the soundness of the district court's explanation for it."  Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1151 (11th Cir. 2005).  Judgment as a matter of law is appropriate under Rule 50(a) of the Federal Rules of Civil Procedure "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a).  In reviewing the judgment as a matter of law, the court must analyze all the evidence in the record and draw all reasonable inferences in favor of the nonmoving party.  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192-93 (11th Cir. 2004).

The plaintiff must present enough evidence so that a reasonable jury could find that the plaintiff has established every element of his or her claim.  Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 659 (11th Cir. 1998).  The

---

[20] Pay stubs show Kaw started work on October 16, 2006.  (R-149: 8).

"presence of a mere scintilla of evidence" is not enough to create a jury question; rather, a "conflict in substantial evidence" must exist. Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 910 (11th Cir. 1996); Williamson v. Motorola, 303 F.3d 1284, 1289-90 (11th Cir. 2002). If a reasonable jury would have no legally sufficient basis to find for the nonmoving party on an issue, the court should grant judgment as a matter of law. Cleveland, 369 F.3d at 1192; see also Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001) (stating judgment as a matter of law should be granted when the evidence in favor of the moving party is "so overwhelming[] . . . that a reasonable jury could not arrive at a contrary verdict.").

## SUMMARY OF THE ARGUMENT

The undisputed facts establish that Kaw failed to show that the School Board regarded her impairment as a disability, as that term is defined under the ADA. In particular, Kaw failed to establish that the School Board perceived her condition, which undisputedly is not a disability under the ADA, as substantially limiting her major life activity of ability to maintain consciousness. As Kaw failed to meet her burden and did not present sufficient evidence to establish her prima facie case, the School Board was entitled to judgment as a matter of law, which the district court properly entered in this case.

Mere awareness of an impairment that can cause a person to lose consciousness does not establish that the person is "regarded as" disabled. Kaw failed to show that the School Board perceived her impairment to be more severe and frequent in nature than her actual impairment was. Kaw also failed to establish the School Board acted based on myths or stereotypes when the School Board fired Kaw after missing more than five weeks of work, much of that time without contact with Smith or an explanation of when she would be returning to work. Therefore, judgment as a matter of law was proper because Kaw did not establish the first element of the prima facie case.

Kaw also failed to establish the other elements of her prima facie case, which further supports the entry of judgment as a matter of law. She did not show she was qualified to perform the job or that the School Board terminated her from her employment because of her perceived disability and not because she missed more than five weeks of work.

Even if Kaw established the prima facie case, judgment as a matter of law was proper because Kaw did not rebut the School Board's legitimate, non-discriminatory, reason for firing Kaw. Kaw was terminated for excessive absences without communication with her employer and Kaw did not establish this reason was pretext for discrimination. Therefore, judgment as a matter of law was proper, and this Court should affirm the district court's order.

# ARGUMENT

## I.    Kaw did not present evidence sufficient to establish the prima facie case of "regarded as" disabled under the ADA.

At trial, Kaw bore the burden of establishing that she was disabled under the pre-amendment Americans with Disability Act (ADA).[21]    The district court determined on summary judgment that Kaw's impairment, electrocardiogenic syncope and/or fainting condition, was not an actual disability.[22] (R-51, 19-20). As a result, the only issue before the jury was whether the School Board "regarded" Kaw as having "a physical or mental impairment that substantially limits one or more of the major life activities."    42 U.S.C. § 12102(2)(A-C); see also Sutton v. Lader, 185 F.3d 1203, 1208 (11th Cir. 1999) (finding that, to prevail under the "perception" theory, the employee must show the adverse employment action was because the employer regarded the employee "as having a physical [or mental] impairment *as that term is defined by the Act*").

Thus, to satisfy her prima facie case, Kaw had to prove that: (1) the School Board "regarded" Kaw as disabled; (2) she was qualified to perform the essential functions of the job with or without an accommodation; and (3) she suffered an

---

[21]  For purposes of this appeal, pre-Amendment ADA law applies because the claimed discrimination occurred in 2006 and the case was filed on December 7, 2007.  See e.g., E.E.O.C. v. Agro Distrib., L.L.C., 555 F.3d 462, 469 n. 8 (5th Cir. 2009).

[22] This ruling was not appealed.  (Initial Brief of Appellant at 24, n.1)

adverse employment action because of her disability.[23]  Holly v. Clairson Indus.,

L.L.C., 492 F.3d 1247, 1255-56 (11th Cir. 2002).  Failure to prove any element of

the prima face case makes judgment as a matter of law appropriate.  Bogle v.

Orange County Bd. of County Comm'rs, 162 F.3d 653, 659 (11th Cir. 1998);

Smith v. United States, 894 F.2d 1549, 1552 (11th Cir. 1990).

Kaw failed to carry her burden of establishing the prima facie case.

Specifically, she did not present evidence sufficient for a reasonable jury to

conclude that: (1) the School Board perceived Kaw's impairment as substantially

limiting the major life activities of consciousness or working;[24] (2) Kaw was

---

[23] The legal standard for establishing disability under the Americans with
Disabilities Act, the Rehabilitation Act, and the Florida Civil Rights Act is the
same.  Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263-64 (11th
Cir. 2007); Cash v. Smith, 231 F.3d 1301, 1305, n.2 (11th Cir. 2000).  Thus, the
same analysis applies to all three claims.

[24] In her brief, Kaw argues only that the School Board "regarded" her as
substantially limited in the major life activity of consciousness.  Thus, she has
waived any argument that she was perceived as substantially limited in the ability
to work.  United States v. Wright, 607 F.3d 708, 713 (11th Cir. 2010) (stating an
issue not raised by a party in their opening brief is deemed waived); Herring v.
Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005).  Nevertheless, the
record is void of any evidence that the School Board perceived Kaw to be
substantially limited in the major life activity of working.

To be considered substantially limited in the major life activity of working,
Kaw bore the burden of establishing that she was perceived to be "unable to work
in a broad class of jobs."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119
S. Ct. 2139, 2151 (1999).  "Being 'regarded as unable to perform only a particular
job' . . . 'is insufficient, as a matter of law, to prove that [the plaintiff] is regarded
as substantially limited in the major life activity of working.'"  Collado v. United
Parcel Serv., Co., 419 F.3d 1143, 1157 (11th Cir. 2005) (quoting Murphy v. United
Parcel Serv., Co., 527 U.S. 516, 525, 119 S. Ct. 2133, 2139 (1999)).  At most, the

qualified to perform the essential functions of the job at the time of her termination; and (3) the School Board terminated Kaw because of her impairment.

**A.  Kaw did not present sufficient evidence that the School Board perceived her impairment as substantially limiting the major life activity of consciousness.**

Under the ADA, an individual is "regarded as" disabled if the "covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 2149-50 (1999), superseded by statute, eff. Jan. 1, 2009 (2008);[25] see also Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22, 119 S. Ct. 2133, 2137 (1999).  Substantially limited is a high standard to meet because substantial suggests "'considerable' or 'specified to a large degree.'" Sutton, 527 U.S. at 491, 119 S. Ct. at 2150 (citing Webster's Third New International Dictionary 2280 (1976); 17 Oxford English Dictionary 66-77 (2d ed. 1989)); see also Toyota Motor Mfr., Kentucky, Inc. v. Williams, 534 U.S. 184, 196, 122 S. Ct. 681, 691 (2002), superseded by statute, eff. Jan 1, 2009 (2008).

---

evidence shows Kaw was perceived to be unable to fulfill her duties as B.V.'s one-on-one aide due to concerns for B.V.'s safety.  There is no evidence that the School Board perceived that Kaw could not work in another position at the school or in another class of jobs with her nonlimiting impairment.

[25] Sutton v. United Air Lines, Inc. and Toyota Motor Mfr., Kentucky v. Williams are still binding precedent in pre-Amendment ADA cases.  See, Agro, 555 F.3d at 469 n.8, 470 (using Sutton because the 2008 ADA Amendments are not retroactive).

To be regarded as substantially limited in the major life activity of consciousness, Kaw must establish that the School Board perceived her as "'[u]nable to perform' . . . or 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person in the general population." Sutton, 527 U.S. at 480, 491, 119 S. Ct. at 2145, 2150-51 (quoting 29 C.F.R. § 1630.2(j)); Deas v. River West, L.P., 152 F.3d 471, 480 (5th Cir. 1998) (quoting the same EEOC regulations); see also Lader, 185 F.3d at 1208 (recognizing that to prevail under the "regarded as" disabled prong, the plaintiff has to prove that "the perceived impairment is 'substantially limiting' and *significant*") (emphasis added). Furthermore, Kaw must show the School Board "entertain[ed] misperceptions" about Kaw's nonlimiting impairment and believed that the impairment was substantially limiting in her ability to maintain consciousness. See Sutton, 527 U.S. at 489, 119 S. Ct. at 2150 (stating "it is necessary that a covered entity entertain misperceptions about the individual-it must believe . . . that one has a substantially limiting impairment when, in fact, the impairment is not so limiting").

Kaw failed to present sufficient evidence "that the impairment, as [the School Board] perceived it, was substantially limiting" on the major life activity of consciousness. Deas, 152 F.3d at 480. Kaw was required to prove: (1) more than just mere awareness of a nonlimiting impairment; and (2) the School Board

perceived the nonlimiting impairment to be more severe, frequent, and debilitating in nature than the actual impairment. The evidence presented by Kaw establishes, at most, that the School Board perceived Kaw's impairment to be exactly what it was, a nonlimiting impairment that occasionally caused her to lose consciousness. This is insufficient to satisfy the first element of the prima facie case, and the district court properly entered judgment as a matter of law in favor of the School Board.

> **1.  Mere awareness of a nonlimiting impairment does not establish "regarded as" disabled.**

It is undisputed that the School Board was aware of Kaw's syncope and fainting spells long before her termination. Despite Kaw's impairment—which caused her to lose consciousness at work twice during the 2005-2006 school year—Smith rehired Kaw as B.V.'s aide for the 2006-2007 school year. Kaw argues that the School Board's awareness of her impairment, standing alone, establishes that the School Board regarded her as substantially limited in the major life activity of consciousness. (Initial Brief of Appellant at 23). This Court has clearly stated that mere awareness of an impairment *does not* establish "regarded as" disabled. Lader, 185 F.3d at 1209 (emphasis added).

Moreover, the Fifth Circuit has rejected the same line of reasoning Kaw urges this Court to follow. See Deas, 152 F.3d at 479 (holding an employee's argument that, because her employer perceived her as suffering from seizures, the

employer must have regarded her as substantially limited in the major life activities of seeing, hearing, and speaking, and thus discharged her purely based on the perception that if she suffered a seizure during work she would "'be unable to see, hear or speak,'" was "entirely conclusory and does not constitute evidence from which a reasonable trier of fact could conclude that [the employer] regarded [the employee] as 'substantially limited' in her ability to see, hear, and speak.").

The School Board's mere awareness that Kaw experienced fainting spells is not enough to establish the School Board perceived her as disabled.  See Lader, 185 F.3d at 1209; see also Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996). While Kaw has shown the School Board was aware of the impairment, she has not shown more, and her claim fails for this reason alone.

> **2. Kaw failed to provide evidence that showed the School Board perceived her nonlimiting impairment to be more severe and frequent in nature than it actually was.**

Even if Kaw presented evidence beyond the School Board's mere awareness of her impairment, Kaw did not provide sufficient evidence to establish the School Board perceived Kaw's impairment to be substantially limiting on the major life activity of consciousness.  Indeed, she simply has failed to show that the School Board perceived her impairment to be more severe or limiting than it actually was. In determining whether an impairment substantially limits a major life activity, courts look at the nature and severity of the impairment.  See Lader, 185 F.3d at

1208-09 (considering "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or expected permanent or long term impact of or resulting from the impairment.") (citation omitted); see also Deas, 152 F.3d at 480 (looking at the "condition, manner, or duration" of the impairment).

This Court has held seizures that are "infrequent, not severe, and controlled by medication" do not substantially limit a major life activity. Sicilia v. United Parcel Serv., Inc., 279 F. App'x. 936, 938 (11th Cir. 2008) (per curiam); see also Cash v. Smith, 231 F.3d 1301, 1305-06 (11th Cir. 2000) (holding occasional seizures that last between a few seconds to several minutes and are largely controlled by medication do not substantially limit a major life activity). Despite Kaw's conclusory remarks that a condition rendering a person unconscious is a disability,[26] courts have consistently held that an impairment that causes a person

---

[26] For example, Kaw argues that an impairment that causes a person to lose consciousness substantially limits almost every major life activity, including the major life activity of consciousness. (Initial Brief of Appellant at 23-24). The cases cited, however, do not support that proposition.

In Martinson v. Kinney Shoe Corporation, the issue of whether the employee's seizures accompanied by loss of consciousness was a disability under the ADA was not before the court. 104 F.3d 683, 686 (4th Cir. 1997). Thus, Kaw's block quotation from Martinson is taken out of context and does not establish that seizures accompanied by loss of consciousness are a disability. See Deas, 152 F.3d at 477 (finding the plaintiff-appellant Deas misread the court's opinion--and the same block quote used by Kaw--in Martinson to support her position that seizures are a disability per se).

to lose consciousness is not a disability per se. See Deas, 152 F.3d at 479, n.18 (holding loss of awareness—a state of consciousness—is not a per se disability); Moreno v. Am. Ingredients Co., 2000 WL 527808, *2-3 (D. Kan. 2000) (holding epileptic seizures that cause an employee to lose consciousness was not a disability); Cadley v. N.Y. Dep't of Transp., 2008 WL 465199, *8 (S.D.N.Y. 2008) (holding an employee's syncope that caused him to lose consciousness six times at work was not a disability). Indeed, the district court concluded that Kaw's syncope and fainting spells were not a disability, and Kaw does not challenge that finding.

Likewise, several courts have found an employer's belief that an employee loses consciousness and is not in control during a seizure is not enough to establish that the employer perceived the employee as substantially limited in the major life activity of consciousness. See Deas, 152 F.3d at 480 (finding that, an employer's

---

Furthermore, Kaw misstates the holding in LaChance v. Duffy's Draft House, 146 F.3d 832 (11th Cir. 1998), as standing for the proposition that there is no question seizures accompanied by loss of consciousness are a disability. (Initial Brief of Appellant at 26). In LaChance, the employee had a history of suffering a seizure at least every other week and suffered three seizures in his first two days at work as a line chef. Id. at 833-34. This Court *did not* directly state that the employee's seizure condition and loss of consciousness was a disability, only that the employee's loss of consciousness was a danger to himself and others. Id. at 836 (emphasis added).

More importantly, Kaw did not appeal the district court's finding that her syncope and loss of consciousness are not disabilities under the ADA. Thus, in order to prevail, Kaw must show that the School Board perceived her condition as more severe and frequent than it actually was.

belief that during a petit mal seizure an employee would lose some or *all* awareness and would be unable to see, hear, or speak for several seconds is insufficient evidence for a rational jury to conclude that an employer perceives the impairment as substantially limiting a major life activity) (emphasis added); see also Lomastro v. Caddo Parish Sheriff, 2006 WL 1805875, *4 (W.D. La. 2006) (finding that an employer's decision not to promote an individual with a history of seizures because the employer believed there was an increased risk of seizures did not violate the ADA). In Lomastro, the court found that an employer's belief that the employee "was 'not in control' during a seizure [wa]s insufficient to show that the [employer] perceived [the employee] as being *substantially limited* in any major life activities," including the major life activity of consciousness. Lomastro, 2006 WL 1805875 at *4.

Thus, in order to establish her claim, she must show that the School Board perceived her condition to be more severe and frequent than it was. In other words, she must establish that the School Board perceived her impairment to cause more than temporary or occasional loss of consciousness.

### a. Evidence of the School Board's perception.

The only evidence of the School Board's perception of the nature and extent of Kaw's impairment is Kaw's testimony that Smith told her, after she had been fired, that she presently was a liability because of her fainting, which might

endanger herself or the students.[27]   This was offered as direct evidence that the School Board perceived Kaw's impairment to substantially limit her in the major life activity of consciousness.   Even if the statement could be interpreted as Smith's acknowledgment that he fired Kaw because he was concerned she could faint at work, Deas and Lomastro explain that this alone would not be enough to prove the School Board perceived her to be disabled as defined by the ADA.

Moreover, this statement does not show or even suggest that Smith perceived Kaw's condition to be more severe than it was.   It is undisputed that Kaw could experience fainting spells as a result of her syncope, and this was confirmed as late as October 9, 2006, which was after the date of her termination. Smith's statement is nothing more than an acknowledgment of Kaw's *actual* condition, which the district court held was not a disability under the ADA and is not challenged in this appeal.   Indeed, Smith allegedly made this statement in response to a note from Kaw's doctor's office, which specifically informed Smith

---

[27] This conversation occurred after Kaw had been terminated.  Kaw's symptoms had not been diagnosed as a syncope when she met with Smith on September 18, 2006.  (R-157: Ex. 36).  The first indication that Kaw had missed work due to her syncope came after she had been terminated when Dr. Curtis's fellow wrote Kaw a note on October 9, 2006, that stated she was being treated for vasovagal syncope and that it could not be guaranteed that Kaw would not pass out again.  (R-156: Ex. 10).  Thus, it is undisputed that due to Kaw's lack of communication with the School Board, the School Board had no knowledge at the time of the termination of the medical reason, if any, for Kaw's absences or that her absences were due to anything other than a temporary condition, illness, or personal reason, such as the previous absences in the 2005-2006 school year.

that Kaw was suffering from the syncope condition and could experience fainting spells. As Kaw has failed to show that the School Board perceived her condition to be more severe than it was, her claim fails and judgment as a matter of law was properly entered in the School Board's favor.

### b. The School Board did not perceive Kaw to have a disability

Nevertheless, setting aside that Kaw has failed to present any evidence that her condition was perceived to be more severe than it was, the evidence in the record, even when viewed in the light most favorable to Kaw, does not establish that the School Board perceived her impairment to be so severe and frequent in nature that it substantially limited her ability to maintain consciousness.

An impairment that causes an employee to lose consciousness once a month or every other month does not substantially limit a major life activity. Moreno, 2000 WL 527808 at *2-3.[28] In Moreno, the employee suffered from epileptic attacks that caused him to lose consciousness "approximately every month or month and a half to two months." Id. at *2. The employee would "become[]

_____

[28] Otting v. J.C. Penney Co., cited by Kaw in support of her proposition that seizure activity substantially limits a major life activity, distinguishes Moreno based on the frequency of the seizures. 223 F.3d 704, 710 n.4 (8th Cir. 2000). In Otting, the employee suffered seizures two to three times a month. Id. at 706. Kaw presented no evidence that Smith perceived her impairment to cause her to lose consciousness this frequently. The only fainting incidents Smith was aware of were the two Kaw suffered during the 2005-2006 school year. Smith rehired Kaw after these two incidents and Kaw did not lose consciousness at school again.

dizzy, disoriented, and weak for several hours" after an attack.  Id.  The court

recognized that the employee's impairment was "most likely debilitating at times"

and caused the employee to be unable to work during an attack.  Id.  The court

held, however, that the symptoms were not "with such force and frequency" that

the employee was substantially limited in the major life activity of working.  Id. at

*2-3.  Other courts likewise have ruled that infrequent seizures that cause loss of

consciousness do not substantially limit a major life activity.  See Cadley, 2008

WL 465199 at *8 (rejecting the employee's argument that an impairment that

caused him to lose consciousness six times at work substantially limited the major

life activities of walking, seeing, speaking, and caring for oneself, because the

employee's loss of consciousness was infrequent in nature, and did not rise to the

level of substantially limiting a major life activity); Corley v. Dep't of Veterans

Affairs, 218 F. App'x. 727, 729, 735-36 (10th Cir. 2007) (stating monthly seizures

that occasionally caused the employee to pass out and affected the employee's

sleeping only established that the employee suffered from "a sporadic or

intermittent impairment"  that was not severe and did not substantially limit a

major life activity).

       Kaw relies heavily on the Eastern District of Pennsylvania's decision in Bley

v. Bristol Township School District, but fails to acknowledge the serious nature of

grand mal seizures[29] that the employee suffered in that case. 2006 WL 220669 (E.D. Pa. 2006). The employee suffered from *grand mal seizures* three to four times each year. Id. at *1 (emphasis added). These seizures would last between three and five minutes and would cause the employee to shake uncontrollably and sometimes lose consciousness. Id. The court denied the employer's motion for summary judgment, because the impairment was permanent and caused the employee to be severely restricted in major life activities while experiencing a seizure and shortly thereafter. Id. at *6. The court emphasized the employee was unable to control when she would suffer from a seizure, or the *severity* of the seizure, through medication. Id. (emphasis added).

---

[29] The symptoms associated with the different types of seizures vary wildly, and grand mal seizures are at the most severe end of the spectrum because these seizures can cause "frequent, prolonged, and potentially life-threatening convulsions." Deas, 152 F.3d at 478 n. 17; see also Diseases 709 (Springhouse ed., 2d ed. 1997) (describing the symptoms characteristic of a grand mal seizures as: "Typically, this seizure begins with a loud cry, . . . [t]he patient falls to the ground, losing consciousness. The body stiffens and then alternates between episodes of muscle spasms and relaxation. Tongue biting, incontinence, labored breathing, apnea, and subsequent cyanosis may also occur. The seizure stops in 2 to 5 minutes."). Grand mal seizures are not the only type of seizure that can cause unconsciousness. See Diseases 709 (Springhouse ed., 2d ed. 1997) (stating secondarily generalized partial seizure, myoclonic seizure, and akinetic seizure can cause loss of consciousness and absence (petit mal) seizures can cause a "change in the level of consciousness"). While, Kaw's actual impairment, electrocardiogenic syncope, can cause loss of consciousness, courts have routinely held this impairment is not severe enough to substantially limit a major life activity. (R-51: 19-20) (citing cases holding syncopes do not substantially limit a major life activity).

For Kaw to analogize her temporary loss of consciousness, which occurred twice during her employment, and the School Board's perception of her symptoms, with the employee in <u>Bley</u> who was unable to control the severity or occurrence of her grand mal seizures is too much to ask and is not supported by any evidence in the record. <u>Bley</u>, 2006 WL 220669 at *6. Kaw's impairment was not a serious condition that caused violent convulsions and could not be controlled by medicine or preventative measures, and there is no evidence the School Board perceived it as this severe. Indeed, as much as ten percent of the population has experienced a fainting spell similar to those experienced by Kaw. (R-152: 170). Kaw generally had warning signs that would allow her to prevent fainting by simply sitting or lying down and staying hydrated. (R-134: 60-61). If Kaw did faint, her condition did not cause her to severely and suddenly drop to the ground; rather, she would end up lying down and usually recover very quickly. (R-152: 166, 208). The only aftereffects Kaw would experience after a fainting spell was that she would be exhausted for three to four hours. (R-149: 13).

The only evidence in the record of how the School Board perceived Kaw's impairment was based on the events that occurred at school and how she characterized her symptoms.[30] Kaw told Smith and other people at Benito Middle

_____

[30] The School Board would not be liable if it relied on Kaw's, or her doctors, characterization of her nonlimiting impairment as something more severe than it was. <u>See</u> <u>Taylor v. Pathmark Stores, Inc.</u>, 177 F.3d 180, 193 (3d Cir. 1999)

School that her impairment was "not life threatening" and that she was "fine," but the impairment was just something she had to deal with. (R-134: 73). Smith had no reason to believe Kaw's impairment was severe or frequent, and he brought Kaw back for the 2006-2007 school year despite knowing she had twice lost consciousness at work. (R-134: 71, 73), (R-51: 4).

After being rehired, Kaw did not have another fainting spell at work.[31] On August 24, 2006, the only symptoms Kaw experienced were lightheadedness and pressure in her chest, which is unrelated to the syncope. (R-134: 76). Smith did not observe Kaw this day and did not have contact with her until September 18, 2006. (R-134: 86), (R-152: 27-29).

What the School Board perceived—as recounted from Kaw's version of the facts at trial—is that she was absent from work for nearly a month and then appeared in the principal's office on September 18th with an event monitor, which alerted twice in a short amount of time. As it turned out, the monitor was not even necessary and the syncope did not keep her out of work, but none of this was known to the School Board at the time. (R-152: 176-77, 196, 204-06), (R-156: Ex. 3, Ex. 4), (R-157: Ex. 36). The limited information provided by Kaw and her

---

(holding "[i]f the employer is factually mistaken about the extent of an employee's impairment and the employee or his agent is responsible for the mistake, the employer is not liable under" the regarded as prong of the ADA).

[31] It is undisputed that Kaw did not tell Smith she lost consciousness the night after her tilt table test. (R-134: 92-94). She was terminated the next day. (R-134: 95-96).

doctors[32] during her five-week plus absence from work informed the School Board's decision and made it difficult for the School Board to assess the situation and determine when she was cleared to work. Indeed, it was consequently unclear how long Kaw would be out of work, and the School Board could not plan for her absences. In addition, Smith instructed Kaw to keep him informed. It is undisputed that Kaw failed to contact him *at all* after September 18th. Moreover, based on Kaw's own testimony, he expected her to return to work after her tests were completed on October 3rd, but she did not return to work or contact him.

---

[32] Kaw's first meeting with Smith occurred on September 18, 2006. Prior to this meeting, Kaw delivered a note from Nurse Rodriguez to Smith's office that stated Kaw could not work, but the note did not provide any explanation. (R-156: Ex. 3). Dr. Curtis did not think the work restriction was necessary, and when Kaw met with Smith on September 18th, she brought a note from Dr. Curtis that simply stated Kaw may return to work. (R-156: Ex. 4). The note did not discuss Kaw's treatment. (R-156: Ex. 4). Kaw delivered the note to Smith wearing a heart monitor, which Dr. Curtis did not think was necessary for Nurse Rodriguez to order in the first place. (R-152: 36, 204-06). Kaw made no mention to Dr. Curtis that the heart monitor kept her up the night before, (R-152: 204-06), but made a point to tell this fact to Smith after the monitor alerted twice in his office. (R-134: 90). Kaw did not tell Smith the monitor turned out to be defective or was unnecessary. (R-152: 36). After meeting with Smith on September 18th, and, being specifically told to keep him in the loop, Kaw had no further communications with Smith until after she was terminated. (R-134: 92). During this time, Kaw went to the emergency room for symptoms unrelated to her syncope, found out the results of her tilt table test, and even had another syncopal episode. (R-134: 88, 92-94), (R-149: 16), (R-152: 39, 94-95, 181-82, 192-93, 213-14). The School Board was not aware of these facts when Kaw was terminated on October 5, 2006. Indeed, it was unaware that Kaw was being treated for a syncope until October 9, 2006. (R-156: Ex. 10).

When Kaw met with Smith on September 18th, Dr. Curtis had not yet diagnosed her symptoms to be related to the syncope. (R-157: Ex. 36). It is undisputed that Smith was not aware that her treatment was related to her syncope and Smith did not comment or suggest that he was concerned about Kaw's ability to maintain consciousness,[33] only the best interests of B.V. (R-156: Ex. 4). Kaw's history, the symptoms she experienced at work, and her statements and explanations provided to Smith, could only lead a reasonable person to believe that Kaw suffered from a non-severe, infrequent, and controlled impairment that could occasionally cause her to lose consciousness, or feel lightheaded and dizzy.

There is no evidence in the record to suggest or conclude that the School Board had any other perception of Kaw's condition. Case law has held these symptoms are not substantially limiting on a major life activity. See Sicilia, 279 F. App'x. at 938 (opining seizures that are "infrequent, not severe, and controlled by medication" do not substantially limit a major life activity); see also Moreno, 2000 WL 527808 at *2-3 (holding an impairment that causes an employee to lose consciousness once a month or every other month does not substantially limit a major life activity); Cadley, 2008 WL 465199 at *1, *8 (concluding the employee's syncope that caused him to lose consciousness six times at work was

_____

[33] Smith's concern over the defective heart monitor Kaw was wearing during the September 18, 2006 meeting was that it would be a distraction for her to get up and leave to transmit information, not that she was at risk of losing consciousness. (R-134: 92-93).

not a disability, because the employee's loss of consciousness was infrequent in nature and did not rise to the level of substantially limiting a major life activity).

Similarly, the School Board would have no reason to believe Kaw suffered from severe aftereffects as a result of her loss of consciousness. Indeed, there is no evidence that Smith or the School Board considered or perceived the aftereffects of the fainting spells to be disabling or substantially limit Kaw's activities. Dr. Curtis testified a patient who faints will recover quickly. (R-152: 166). Furthermore, Kaw admitted that she would only feel exhausted for three to four hours afterwards. (R-152: 166), (R-149: 13). Like the symptoms and frequency of the syncope, the aftereffects, even if perceived or considered by the School Board, would not be substantially limiting on a major life activity. See Cash, 231 F.3d at 1305-06 (holding an employee's occasional seizures that last between "a few seconds to several minutes and result in [the employee] feeling numb on the left side of her body" does not substantially limit a major life activity); see also Moreno, 2000 WL 527808 at *2-3 (holding seizures that would cause the employee to become "dizzy, disoriented, and weak for several hours" following an attack and could be debilitating at times was not enough to be substantially limiting on a major life activity).

The School Board's perception of Kaw's nonlimiting impairment did not change at any time during the 2006 school year. The only thing that changed was

Kaw missed over five weeks of work after feeling lightheaded and stopped communicating with Smith. See Hilburn v. Murata Elecs. North Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999) (holding an employer does not regard an employee as substantially limiting in a major life activity because the employer took into consideration the employee's attendance record). Smith requested Kaw keep him in the loop while she was absent. (R-134: 92). Despite changes in her condition, Kaw admits she did not have further contact with Smith until after she was fired, which was over two weeks later. (R-152: 36-38, 92).

Unfortunately, during the 2006-2007 school year, Smith did not have the luxury of relying on B.V.'s nanny to watch B.V. while Kaw was absent for an indefinite period of time. (R-152: 17-18). Instead, Smith was forced to move Carter from his current position in a self-contained classroom to cover for Kaw. (R-152: 19-20). After missing work for more than five weeks with limited communication from Kaw, Smith decided to terminate her for failure to fulfill the responsibilities of her position, not because of myths or misperceptions that Kaw was unable to maintain consciousness due to a nonlimiting impairment.[34] (R-156:

---

[34] This whole case turns on how Smith perceived Kaw's nonlimiting impairment. Kaw asks this Court to find that Smith viewed her as substantially limited in the major life activity of maintaining consciousness. Kaw, however, presented little evidence of any statements by Smith regarding her impairment, and these statements do not suggest that he perceived her condition to be more severe than it actually was.

Ex. 5). Kaw was treated no differently than any other temporary one-on-one aide that could be terminated at any time with or without cause. (R-139: 6).

The evidence offered by Kaw was insufficient for a reasonable jury to conclude that the School Board believed Kaw was substantially limited in her ability to maintain consciousness. Therefore, the district court's entry of judgment as a matter of law was proper, and this Court should affirm the district court's ruling.

### B. Kaw did not establish that she was otherwise qualified to perform the essential functions of her job at the time she was terminated.

Even if Kaw could establish the School Board perceived her as disabled, she has not established the other elements of the prima facie case. Kaw must establish she was qualified to perform the essential functions of the job with or without an accommodation.[35] <u>Holly</u>, 492 F.3d at 1255-56. Essential functions are defined as "the fundamental job duties of the employment position." <u>LaChance v. Duffy's Draft House, Inc.</u>, 146 F.3d 832, 835 (11th Cir. 1998) (citing 29 C.F.R. § 1630.2(n)). Courts should consider the employer's judgment in determining what the essential functions of a job are. <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000). Importantly, an employee must be qualified to perform the essential functions of the job at the relevant time period. <u>Lader</u>, 185 F.3d at 1210.

---

[35] It is undisputed that Kaw did not request any accommodation from Smith or the School Board.

As B.V.'s one-on-one aide, Kaw was required to provide continuous supervision and maintain close proximity to B.V. at all times to prevent B.V. from hurting himself. (R-139: 173-74). Indeed, these functions were required to be performed to provide B.V. with a FAPE, as provided by federal law. Kaw's indefinite, excessive absences made it impossible for her to fulfill the responsibilities of her position as B.V.'s aide, and the school was forced to move Carter away from his regular position to cover for Kaw. (R-152: 19-20); see Rocky v. Columbia Lawnwood Regional Medical Center, 54 F.Supp.2d 1159, 1166 (S.D. Fla. 1999) ("If the nature of an employee's position requires her to regularly and reliably attend work, and she fails to meet that requirement, then she is not qualified for her job.") (citing Jackson v. Veterans Admin., 22 F.3d 277, 278-79 (11th Cir. 1994)). All one-on-one aides could be fired with or without cause and because it was determined Kaw was unable to fulfill the responsibilities of the position, Smith decided to fire her. (R-156: Ex. 5).

Kaw failed to present evidence that she was qualified to perform the essential job function of providing B.V. continuous supervision during her indefinite absence from work before being terminated. Thus, Kaw did not establish the second prong of the prima facie case for "regarded as" disabled and judgment as a matter of law was proper.

**C.**   **Kaw did not establish that she was terminated because of misperceptions of her nonlimiting impairment.**

Kaw had the burden of proof to show that she was fired because of her perceived inability to maintain consciousness. Holly, 492 F.3d at 1255-56. The evidence shows Kaw missed over a five weeks of work after feeling lightheaded and stopped communicating with Smith. The fact that Kaw was not fired after initially missing three to four weeks of work does not show discrimination; rather it shows Smith gave Kaw the benefit of the doubt because she had been an exemplary employee in the past. Kaw failed to keep Smith informed of her condition during her absence, and Smith decided to terminate her employment because she was unable to perform the responsibilities of her job.

The record clearly establishes that the School Board was aware of Kaw's impairment. Kaw failed to show that the School Board was motivated by her perceived impairment, not her extended, indefinite absences and failure to communicate with Smith. Indeed, there is no evidence in the record for a reasonable jury to find that, having re-hired Kaw notwithstanding knowledge of her impairment, Smith would terminate her a year later based on the same knowledge, especially considering Kaw did not lose consciousness at work during the 2006-2007 school year. Kaw was terminated for her indefinite, excessive absences without communicating with Smith, and she has not produced sufficient evidence to show that Smith's perception of her syncope played a role in that

decision. Indeed, Smith was unaware that her syncope was related to her absences. Thus, there is no evidence that this perception of her condition factored into the decision to terminate her.[36]

This Court should affirm the district court's judgment as a matter of law, because Kaw failed to establish the third prong of the prima facie case for "regarded as" disabled.

## II. Kaw did not present evidence sufficient to show the School Board's legitimate, non-discriminatory, reason for firing Kaw and was pretext for discrimination.

Even if Kaw established her prima facie case, she has failed to present sufficient evidence that the School Board's reason for termination was pretext for discrimination. See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004); Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). Smith offered the legitimate, non-discriminatory, reason for terminating Kaw as "not able to fulfill the responsibilities of the position for which [she was] hired" and Kaw has not presented sufficient evidence to rebut that reason. (R-156: Ex. 5).

---

[36] It is undisputed that Smith made no reference to Kaw's condition prior to her termination. He only referenced her condition, according to Kaw's testimony, after her termination and after she handed him a note from her doctor's stating her diagnosis of the syncope. Even according to Kaw's testimony, Smith never said that he terminated her because of this condition.

Kaw ultimately bore the burden of showing her termination was based on discrimination due to a perceived disability. As stated <u>supra</u>, Kaw has failed to provide evidence that Smith terminated her for any reason other than her indefinite absence from work and lack of communication. Smith acknowledged that he considered Kaw to be an "exemplary employee" who had done "wonderful things with B.V." and even gave Kaw a positive recommendation when another school called him. (R-134: 101, 147), (R-152: 78). There is no evidence Smith fired this "exemplary employee" because of a perceived impairment that was widely known long before Kaw's termination. He hired her after knowledge of her condition. Kaw did no present any evidence of discriminatory animus. Indeed, she was fired only when she stopped performing the essential functions of her job.

The only thing that changed was Kaw was absent from work for over five weeks and her lack of communication. She was told to return to work after her tests were completed. She did not return to work and failed to notify or communicate with Smith. Thus, Smith made the hard decision to terminate a good employee because of job abandonment, not because of discrimination.

## CONCLUSION

The district court properly entered judgment as a matter of law in this case, because Kaw failed to carry her burden of providing sufficient evidence that a reasonable jury could find the School Board perceived her nonlimiting impairment

as substantially limiting the major life activity of consciousness. Moreover, she did not show she was qualified to perform the essential functions of her job at the time of her termination or that the reason for her termination was anything other than her indefinite, extended absences without communication with Smith. Therefore, this Court should affirm the district court's judgment as a matter of law in favor of the School Board.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,401 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point Times New Roman style.

DATED this ____24th____ day of September, 2010.

Respectfully submitted,

____/s/ *Thomas M. Gonzalez*_____
Thomas M. Gonzalez
Florida Bar No.: 192341
Thompson, Sizemore, Gonzalez & Hearing, P.A.
One Tampa City Center
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
Attorneys for the Appellee

## **CERTIFICATE OF SERVICE**

The undersigned counsel of record certifies that a copy of the forgoing was furnished via Federal Express and United States Mail on this _____24th_____ day of September, 2010, to the following:


   /s/ *Thomas M. Gonzalez*_____
Thomas M. Gonzalez